## IN RE CONTRIBUTION RATE FOR 1966 TO THE ACCOUNT OF BUTTERFIELD FOODS, INC. v. GEORGE J. VAVOULIS.

161 N. W. (2d) 321.

August 23, 1968—No. 40,937.

*Dorsey, Marquart, Windhorst, West & Halladay* and *Phillip H. Martin,* for relator.

*Douglas M. Head,* Attorney General, and *Peter C. Andrews,* Assistant Attorney General, for respondent.

PETERSON, JUSTICE.

Certiorari is brought by relator, Butterfield Foods, Inc., to review the determination by the Department of Employment Security of relator's contribution rate under the Minnesota Employment Security Law (Minn. St. c. 268) for the calendar year 1966.

Relator is a Minnesota corporation engaged in turkey processing. It was organized on February 18, 1965, and at that time acquired the assets and business of Butterfield Produce Company, Butterfield Produce Truck Company, and Butterfield By-Products, Inc. It commenced business on March 4, 1965.

Pursuant to the requirements of Minn. St. 268.12, subd. 8, relator filed a report to determine liability under the law, dated April 9, 1965; and it simultaneously made application to succeed to its predecessors' employment experience records. On April 15, 1965, the department, by letter, informed relator of its determination that relator was eligible to succeed to the employment experience records of its predecessors as provided by § 268.06, subd. 22, and that an experience rate of 3 percent had been assigned to relator for 1965. The letter stated further:

"Any protest from the rate of 3.00% for 1965 must be made in writing within thirty days from the date of this letter. In the absence of a written protest or a voluntary contribution for 1965, the assigned rate shall be final and shall not be subject to collateral attack at any later date."

Relator made no protest either upon receiving this letter or upon receiving the department's notices of benefits chargeable to its account for the second half of 1964 and for the first half of 1965.

Timely protest was made by relator, however, to the department's notice of its 1966 contribution rate, which was redetermined to be 4.50 percent. In a subsequent letter dated April 25, 1966, relator attempted to withdraw and revoke its April 9, 1965, application to be deemed a successor to its predecessors' experience records. It requested that the revocation be made retroactive to the commencement date of its business, or, if that were impossible, to January 1, 1966. The department, after exhaustion of its administrative hearing procedures, affirmed the assigned

contribution rate and refused to revoke the original transfer of the predecessors' experience records.

Two grounds are asserted by relator in support of its position that it should be allowed to revoke its election to be assigned the experience records of its predecessors and accordingly to be granted the contribution rate as a new employer for the calendar year 1966:

■ Relator contends, first, that its application for the experience records of its predecessors was revocable because it was based upon a material mistake of fact. It asserts that it mistakenly understood that it was necessary to apply for the predecessors' experience records in order to receive credit for the predecessors' 1965 payments. Minn. St. 1961, § 268.04, subd. 25, based an employer's contributions to the employment security fund on the first $3,000[1] of wages paid to an employee. Relator asserts, but the department denies, that a successor employer in fact receives this credit even though it did not elect to succeed to its predecessors' experience records. There is, however, no evidence of record to support relator's contention that a successor employer receives credit for wages paid to an employee by the predecessor employer for purposes of the wage limitation regardless of whether he elects the predecessor's experience records or its contention that relator's election was based upon the mistaken understanding that a successor received credit only if he made such election. We do not intimate, by so holding, that such mistake, if established, would in all circumstances constitute an adequate ground for the relief sought.

■ Relator contends, as its second ground, that it is entitled to the contribution rate for new employers because of subsequent unfavorable changes in the statute affecting its election. The legislature in 1965 increased employers' liability under the Minnesota Employment Security Law. Effective January 1, 1966, § 268.06, subd. 8, provides for a maximum contribution rate of 4.50 percent rather than 3 percent,[2] and effective July 1, 1966, § 268.04, subd. 25, provides for a taxable wage base of the first $4,800 rather than the first $3,000 of remuneration paid an

---

[1] Raised to $4,800 after July 1, 1966, by L. 1965, c. 741, § 3.

[2] See, L. 1965, c. 741, § 8.

employee.[3] No change was made in the contribution rate of 2.70 percent for new employers who did not elect to transfer their predecessors' experience records.

Relator cites Commercial Shearing & Stamping Co. v. Commr. of Int. Rev. 36 T. C. 433, and Cereal Products Refining Corp. v. Commr. of Int. Rev. 39 B. T. A. 92, to support the proposition that a taxpayer is entitled to revoke an election because of subsequent unfavorable changes in the law. We think these cases are distinguishable from the present situation and do not control our decision. The issue in Commercial Shearing was whether an affiliated group of corporations should be allowed to revoke their election to file consolidated income tax returns after the 1954 Internal Revenue Code was enacted and pursuant to which new regulations were promulgated making it more advantageous to file separate returns. Holding that the taxpayer was not precluded from a new election, the court quoted the Cereal Products case with approval (36 T. C. 437):

"It is not material to explore the legislative history of the consolidated returns provisions in the various revenue acts excepting to point out that it is clear that Congress has allowed corporations a new election from time to time as the law has been changed and that when Congress intended that there should not be a new election under a new act it has so stated in the new act. * * * Thus, we understand that whatever may have been the requirement under a specific revenue act *and under approved regulations of the Commissioner,* it has been recognized that there is a new election when the revenue act is changed, unless the revenue act specified otherwise." (Italics supplied.)

The instant case is distinguishable because the legislative changes relate to the matters of contribution rate and the wage base subject thereto rather than directly to the question of election while the regulations in the above cases dealt directly with elections.

Relator admits that at the time of the election it knew that the experience records of its predecessors were unfavorable. Therefore, it can be assumed that relator foresaw that its election would result in a higher

---

[3] See footnote 1, *supra.*

contribution rate than the one for new employers. Although contribution rates are based upon both the taxable payroll and the benefits charged to an employer's account, the legislative changes affected only the element of taxable payroll. At the time relator made its election it had constructive notice under § 268.22 that there was no vested right either to a maximum contribution rate of 3 percent or to a $3,000 limitation on the taxable wage base.[4] It does not seem an unjust result to hold that the legislative changes in the Minnesota Employment Security Law made in 1965 do not give relator the right to withdraw its election to succeed to the experience records of its predecessors.[5]

Affirmed.

---

[4] Minn. St. 268.22 provides: "The legislature reserves the right to amend or repeal all or any part of sections 268.03 to 268.24 at any time; and there shall be no vested private right of any kind against such amendment or repeal. All the rights, privileges, or immunities conferred thereby, or by acts done pursuant thereto, shall exist subject to the power of the legislature to amend or repeal these sections at any time."

[5] We think, in any event, that the legislature is in a far better position to consider the impact of a different result upon the administration of this complex statute and more aptly to state the conditions, if any, under which a revocation of election should be allowed.